MUTUAL OF OMAHA, A CORPORATION v. ORA E. GEORGE

4674   434 S.W. 2d 307

Opinion Delivered November 25, 1968

*Odell Pollard* and *Jerry Cavaneau* for appellant.

*Howell, Price & Worsham* and *Farrington, Curtis & Strong* for appellee.

CARLETON HARRIS, Chief Justice. The question in this litigation is whether the death of Carl G. George was accidental. Mrs. Ora E. George, mother of Carl, and appellee herein, instituted this action in the Circuit Court of Stone County against Mutual of Omaha, appellant herein, after the son was shot and killed by Henry Criswell on December 27, 1965. On February 5, 1963, appellant had executed and issued its policy of insurance to Carl George in the amount of $5,000.00, appellee being named beneficiary. The policy *inter alia* insured George against death by accidental injury. The company defended the litigation on the ground that the son's death was not accidental. On trial, the court entered its judgment for appellee in the amount of $5,000.00 plus 12% penalty, and an attorney's fee of $500.00. From such judgment, appellant brings this appeal. For reversal, it is contended that the death was not accidental, and appellant is thus not liable.

Henry Criswell, a resident of Stone County, married, and the father of several children, testified that he was awakened around midnight on December 27, 1965, by the constant sounding of an automobile horn in front of his house. On going outside to investigate, he found Carl George and another man that he did not know, sitting in an automobile. Criswell stated that they wanted him to take a drink of whiskey, but he told them that he had quit, and was going in the house and to bed, as he was going deer hunting early the next morning. The witness told them to "go on," turned around and started to the house. George replied, "I'm going in, too," and followed some 20 or 25 feet

behind Criswell. The latter said that the two were drunk, and the man with George could hardly sit up in the car. The witness went inside the house, shut the door, and was in the process of "buttoning it, when he run agin' it." Criswell stated that George ran against the door three or four times, and he (Criswell) said, "Now if you run agin' it anymore, why, when I get my gun, I'm going to help you tear it down." Actually, it appears that Criswell already had the shotgun. From the record:

"When did you get the gun; was it right after you got in the house or was it sometime after?

A. No, I went and got it; I decided that he was aiming to tear it down anyway and I just grabbed my gun."

He said that he loaded it while he was leaning against the door. Criswell never did inform George that he had gotten the gun, nor did he ever tell the latter that he was going to shoot him, but when another lunge was made at the door, Criswell fired. There were no lights burning either inside, or outside, the house when the shot was fired. The witness said that when he fired, he knew he hit George because the latter yelled, though he was not sure whether the exclamation had been "You hit me," or "My God, you hit me," or "killed me." But he heard George leave the porch. Criswell said that George bore the reputation of wanting to fight when he "got to drinking," and that entered his mind as he went into the house and locked the door. The evidence given by this witness reflected that his 21-, 20- and 14-year-old daughters were present in the house at the time, and two or three of his boys were also present. However, there is absolutely nothing in the record to indicate that the presence of the girls in the house had anything to do with George's desire to enter.

Mrs. Beulah Criswell corroborated her husband's testimony that George slammed against the door several times, and that her husband tried to get him to leave but was unsuccessful; she did not remember whether George said anything while this was going on. She stated that she never did hear her husband say anything to George other than for him to go on home, and she did not hear any statement made concerning a gun. In reply to a question as to whether she would have been in a position to hear everything said by her husband, she replied in the affirmative. Both witnesses testified that George had been to their home several times, night and day, and Mrs. Criswell said that George always behaved as a gentleman. She heard no loud voices, threats, profanity, or anything that would indicate any argument when her husband went out to the automobile because of the horn blowing.

Other evidence, which seems particularly pertinent to the point at issue was offered by Criswell. He said that during the four or five-year period that he had known George, they had had drinks together, and he had been on hunting trips which included George. There had never been any ill feeling whatsoever between the two men. In fact, Criswell, when asked if he intended to kill George (when he fired the shot), replied:

"No, I just aimed to scare him away from the door. I didn't want him to tear it down; if he was, I was aiming to help him. I had another shell there in my hand.

Q. So this was a scare shot, right?

A. Right."

After firing the shot, Criswell went to the home of a neighbor, Ralph Rorie, and informed Rorie of what had happened; the two returned to the Criswell premises, found the man not known to Criswell in the car

sleeping, and then discovered the body of George lying on the ground about 10 or 15 feet from the front door of the Criswell home. A closed pocket knife and a package of cigarettes were on the ground, even with the pocket area of the body, apparently having fallen out when George fell. No firearm, or other weapon[1], was found. David Hodges, Prosecuting Attorney for the district which includes Stone County, testified that when he assumed office, a charge of manslaughter was pending against Criswell, and his office dismissed the charge.

We agree with the trial court that, under our decisions, the death was accidental. In *Metropolitan Casualty Insurance Company* v. *Chambers,* 136 Ark. 84, 206 S.W. 64, this court said:

"It is the settled law in this State that proof of death of an insured from injuries received by him raises a presumption of accidental death within the meaning of an insurance clause insuring against injury by external, violent and accidental means, and this presumption will continue until overcome by affirmative proof to the contrary on the part of the insurer."

See also *Aetna Life Insurance Company* v. *Lemay,* 218 Ark. 328, 236 S.W. 2d 85. Accordingly, we start out with the presumption that this death was accidental, and the burden was upon appellant to show otherwise. In *Lincoln Income Life Insurance Company* v. *Alexander,* 231 Ark. 64, 328 S.W. 2d 266, we approved an instruction which was given to the jury as follows:

"The killing of an unarmed person by one upon whom he is moving aggressively is by accident or accidental means if the unarmed person did not know and had no reason to believe that his adver-

---

[1]There is no contention on the part of appellant that George was intending to use the closed knife found by his body as a weapon.

sary was armed and intended to kill him upon such advance. Thus, should you find that Alexander was moving aggressively upon Lee, but was unarmed, you are instructed that the death of Alexander was by accident or accidental means unless Alexander knew or had reason to believe that Lee was armed and intended to kill him.''

Appellant vigorously contends that the insured was the aggressor in an affray from which he might reasonably have expected to suffer serious injury or death, and hence, there is no liability on the part of appellant, and the company relies in large measure on *Aetna Life Insurance Company* v. *Lemay, supra.* However, the facts there were far different from those in the instant litigation. Hamn, 69 years of age, rather frail, weighing 135 pounds, was just three days out of the Veterans Hospital where he had been confined for several weeks, when John Clint Lemay accosted him at a grocery store. Lemay had a grievance against Hamn by reason of the former's having been charged with a misdemeanor; Lemay was drinking, and ''invited Hamn out.'' Later that afternoon, Hamn was in a drug store where he had gone to buy a soft drink, when Lemay entered and told Hamn that he had come there to ''beat him up;'' whereupon, he grabbed Hamn by the collar and tie, and attempted to strike him. The drug store proprietor then separated the two men, but shortly thereafter, Lemay ''came back at him like a hyena,'' and grabbed and began beating Hamn. From the opinion:

> ''Witness was physically unable to defend himself against Lemay. His hands being sore and swollen, he could not have hurt Lemay if he had hit him. There was no way to get out of the door; he could not get loose from Lemay.''

Eye witnesses verified these facts, and one witness stated that Lemay hit Hamn and knocked him over the soda fountain; that there was no place to which Hamn

676

could retreat.  While Lemay had Hamn by the throat, chocking him, the latter pulled his gun, fired and killed his assailant.  This court, in reversing a judgment against the Aetna wherein the jury had found the death to be accidental, said:

> "The sum and substance of the testimony of Seth Baker, Morris Davis, Austin Brown, and Carroll Hamn shows clearly that Lemay was the wrong-doer and the aggressor; he brought on the trouble himself, and his conduct and actions were calculated to bring about the very thing that did happen. * * *

> "It is our opinion that the evidence to the effect that Lemay was the aggressor and brought on the difficulty, and persisted to the point where Hamn shot him in self-defense, is not in substantial dispute, and that the verdict, as a matter of law, is without support."

It will be readily observed that these facts bear no similarity to the facts presently before us.  Summarizing the facts in the instant litigation, we find:

1.  These men had been friends for several years, and there had never been any trouble between them.

2.  They had drunk together and hunted together in the same group.

3.  George had visited in the Criswell home several times, and had apparently been welcomed.

4.  On the night of the shooting, George tried to get Criswell to take a drink with him; there was no other point of contention, and though pounding and slamming against the Criswell door, George never at any time made any threat toward Criswell or any member of his family.

5. George was unarmed.

6. No one in the house informed George that Criswell had a gun. Criswell himself testified that he said, "*When* I get my gun, I'm going to help you tear it down." However, Mrs. Criswell testified that she only heard her husband repeatedly tell George to leave. Whichever statement was correct, the fact remains that George was not advised, and apparently did not know, that Criswell had a loaded gun, and *was intending to shoot.* It might be added that in addition to being dark both outside and inside the house, there was no window in the door, and the windows in the front of the house on either side of the door were, according to Criswell, blocked off by washing machines and various assorted items. Also, it being winter time, blankets were hanging over the windows to keep the air out.

7. Criswell himself testified that he only fired the shot as a warning, and had no intention of killing George.

We think under these circumstances, that there was no reason for George to believe that Criswell would shoot him. In fact, we have held similar killings to be accidental where the testimony of aggressiveness by the deceased was far stronger than in the instant case. In *Chambers,* the proof reflected that Chambers and three eye witnesses left Harrison in an automobile together for the town of Capps; all testified that Chambers was drinking, and was abusive toward H. P. Evatt; that Chambers had a large .38 caliber pistol in his possession, and when the last stop was made to take a drink, Chambers, sitting in the middle of the back seat suddenly pointed his pistol at Evatt; one of the other occupants, George Crump, screamed, "My God, don't do that—jump." Evatt testified that Chambers had the pistol in his hand, pointing it at him (Evatt), and that, thinking he was drunk and was going to shoot, Evatt grabbed his own pistol and fired, killing Chambers. Further

evidence reflected that the two men had previously quarreled over a few dollars, and that during the quarrel, both before leaving Harrison and after, Chambers had applied opprobrious names to Evatt. The court, without going into detail, mentioned that there were other circumstances which indicated that Chambers was not drunk, and that the position of the body and pistol did not accord with the manner of the killing as detailed by these eye witnesses. It was then pointed out, that under the well established rule of this court, the jury is the sole judge of the weight of the evidence, and if there is any substantial evidence to support the verdict, it will not be disturbed by this court on appeal. In the case now before us, both sides moved for a directed verdict at the conclusion of the evidence, whereupon the court discharged the jury, and took the case under advisement. Of course, each party making this motion, it was entirely proper for the court to take the case from the jury and decide the issue itself. *National Garages, Inc.* v. *Barry*, 217 Ark. 593, 232 S.W. 2d 655.

We are of the opinion that the testimony heretofore set out presented a question of fact as to whether George's death was accidental as that term was used in the policy, and we hold that there was substantial evidence to support the position taken by the trial court. The judgment is thus affirmed, and we are asked by appellee's attorneys for an additional fee for services rendered on appeal. We think it proper to allow an additional fee of $500.00.

It is so ordered.

BYRD, J., dissents.

CONLEY BYRD, Justice. During oral argument it was conceded by counsel for appellee that the basic rule of law involved in this case is that when an insured is the aggressor in an affray from which a serious injury reasonably might or should be expected to result and he

is killed, the death is not the result of "accidental bodily injuries" and the insurer is afforded a defense to a suit upon such a clause. *Peoples Loan and Investment Co.* v. *Travelers Insurance Co.,* 151 F. 2d 437 (1945); *Lincoln Income Life* v. *Alexander,* 231 Ark. 63, 328 S.W. 2d 266 (1959); *Aetna Life Insurance Co.* v. *Lemay,* 218 Ark. 328, 236 S.W. 2d 85 (1951); *Gilman* v. *New York Life Ins. Co.,* 190 Ark. 379, 79 S.W. 2d 78 (1935); *Price* v. *Businessmen's Assurance Co.,* 188 Ark. 637, 67 S.W. 2d 186 (1934).

It was also conceded that George was aggressively attempting to tear down Henry Criswell's front door over Mr. Criswell's objections. Under such circumstances, I can think of no gentlemanly act George would have performed had he been successful in breaking down the door, nor any reason for believing that George would be treated as a gentleman once he succeeded in entering the home—he certainly would not be in the position of expecting Mr. Criswell to comply with the rules of the Marquis of Queensberry. In my opinion, a person who successfully breaks down the home owner's front door over the objections of the man of the house has no reason to expect any treatment other than being clobbered with something.

Under the foregoing analysis, I am unable to conceive why a person should not expect "serious injury" when he persists in breaking down the front door of a residence over the objections of the man of the house. Therefore, it would follow that the death was not accidental under the authorities cited above.

Nor can I find anything in Criswell's statement that he only intended to scare George away from the door which would make this death accidental. A person playing russian roulette has five chances out of six of not being shot. The beneficiaries under a policy issued to a duelist could recover under the same reasoning by furnishing proof that the surviving duelist was such a poor shot that it was an accident he hit anyone.

For these reasons I would hold that the death was not accidental.